UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Anthia R. Hill and Network Salon Services, LLC, | ) | Case No. 16 B 17113 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee for the bankruptcy estates of Anthia R. Hill and Network Salon Services, LLC | ) | |
| | ) | |
| | ) | Adv. No. 17 A 00072 |
| | ) | |
| | ) | Judge Jacqueline P. Cox |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LG Funding, LLC, a New York limited liability company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

The matter before the Court arises from the adversary complaint filed by the plaintiff,

Frances Gecker, as the chapter 7 trustee (the "Trustee") of the jointly administered bankruptcy

estates of Network Salon Services, LLC ("Network Salon") and Anthia R. Hill ("Ms. Hill,"

collectively, the "Debtors"), against the defendant, LG Funding LLC ("LG Funding"), to recover

alleged preferential and constructively fraudulent transfers pursuant to 11 U.S.C. §§ 547(b) and

548(a)(1)(B), and to disallow claims against the bankruptcy estate filed by LG Funding pursuant

to 11 U.S.C. § 502(d).  For the reasons that follow, judgment is granted in favor of LG Funding

on all three counts.

## I. BACKGROUND

The following facts are derived from the parties' Joint List of Stipulated Facts and Documents [Dkt. 50] and the evidence heard at trial on May 24, 2018.

Network Salon was a distributor of beauty products founded in 2004 by Ms. Hill's husband, Brian Hill; it was located in Chicago, Illinois. While Mr. Hill managed the business and its financial affairs, Ms. Hill performed warehouse and shipping work for the business. At that time, Ms. Hill neither owned nor managed any part of the business. Until 2010, Network Salon struggled financially, which required Mr. Hill to work elsewhere to keep the company and his family afloat.

In 2011, Ms. Hill took over the operation of Network Salon following the brief illness and subsequent death of Mr. Hill. Ms. Hill had no business or financial training or experience prior to taking over the business. At first Ms. Hill was able to effectively run the business. However, it ran into problems accessing products and selling them profitably. She soon became overwhelmed by the financial issues that both her family and Network Salon were experiencing and could not obtain traditional loans through various lenders.

She received a solicitation from Merchant Capital Advance, a merchant cash advance firm, telling her she could access $250,000 by submitting bank records. That deal went through; $250,000 was transferred into the business' bank account and $1090 payments were taken out of the business' account on a daily basis pursuant to that transaction.

LG Funding is a New York commercial finance company engaged in the merchant cash advance ("MCA") business. The MCA industry provides working capital to businesses, particularly small businesses who suffered financially as a result of the 2008 financial crisis.

In an MCA transaction, the merchant sells its accounts receivable for a discounted amount that is paid by the MCA company up-front. The MCA company, as purchaser, recovers the receivables by taking a pre-determined percentage of the merchant's receipts until the MCA company is paid in full.

Network Salon and LG Funding entered into two MCA transactions within two years prior to the date that Network Salon and Ms. Hill filed their chapter 7 bankruptcy petitions on May 20, 2016, ("the Petition Date"). The first contract is dated November 3, 2015 (the "First Agreement"); the second is dated January 8, 2016 (the "Second Agreement," collectively, the "Agreements"). Each agreement was made using LG Funding's standard form contract; each agreement was signed by Ms. Hill as owner of Network Salon. Ms. Hill also signed personal guaranties in connection with each transaction. Each agreement contains the following terms describing the nature of the transactions:

> Merchant hereby sells, assigns, and transfers to LG (making LG the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' [sic] and/or third party payors (the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to LG.

> The Purchased Amount shall be paid to LG by Merchant's irrevocably authorizing only one depositing account acceptable to LG (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as LG receives payment in full of the Purchased Amount.

> . . .

> 1.9 Sale of Receipts. Merchant and LG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price **is not intended to be, nor shall it be construed as a loan from LG to Merchant.** Merchant agrees that the Purchase Price is in exchange for the

3

Receipts pursuant to this Agreement equals the fair market value of such
Receipts.

Trustee's Exs. 18 and 28 (emphasis added).  Each agreement contains a choice of law provision

which selects New York law as the governing law of the contract. *See* Paragraph 4.5.

In total, LG Funding paid Network Salon $125,000 to purchase an interest in a

percentage of Network Salon's receivables; in return, Network Salon became obligated to pay

LG Funding $176,432.  Network Salon granted LG Funding access to a specific bank account,

from which LG Funding could, pursuant to the Agreements, make debits to obtain funds due it.

LG Funding was also allowed access to Network Salon's operating account.  Transcript, p. 14.

Under the First Agreement, LG Funding could debit no more than $3,999 from Network Salon's

bank account each week.  After debiting a $1,500 administrative fee from Network Salon's

account on November 9, 2015, LG Funding debited $3,999 from the account each week from

November 16, 2015 through March 28, 2016.  Under the Second Agreement, LG Funding

debited an additional $2,500 from Network Salon's account each week.  Thus, from January 19,

2016 through March 28, 2016, LG Funding was debiting a total of $6,499 each week from

Network Salon's account.  During the ninety days preceding the Petition Date, LG Funding

debited $38,994 from the account (the "Transfers").  Overall, Network Salon remitted $112,979

to LG Funding.

Overall, Ms. Hill entered into MCA agreements with at least thirteen MCA businesses,

including LG Funding, in order to continue operation of Network Salon and to support her

family from January 2013 until the Petition Date.  In the six months prior to filing the instant

bankruptcy case, Network Salon owed money to at least seven different MCA companies

pursuant to multiple agreements.  As of November 3, 2015, there were eleven UCC-1 financing

statements filed against Network Salon in the office of the Illinois Secretary of State.

By March 2016, Network Salon was paying MCA providers over $30,000 each business day out of fourteen different bank accounts maintained by Network Salon. The capital that Network Salon obtained under the MCA transactions was often used to pay off other MCA transactions.

On May 20, 2016, the Petition Date, Network Salon and Ms. Hill filed petitions under chapter 7 of the Bankruptcy Code; an order was entered for joint administration of the estates. The Trustee was appointed to administer the estates. This adversary proceeding was commenced by the Trustee against LG Funding to recover funds transferred by Network Salon to LG Funding pursuant to the Agreements.

## II. JURISDICTION

The federal district courts have original and exclusive jurisdiction of all cases under the Bankruptcy Code, title 11 of the U.S. Code. 28 U.S.C. § 1334(a). Federal district courts may refer any or all cases under title 11, and any or all proceedings arising under title 11 or arising in or related to a case under title 11, to the bankruptcy judges for the district. 28 U.S.C. § 157(a). The District Court for the Northern District of Illinois refers its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. Northern District of Illinois Internal Operating Procedure 15(a).

Bankruptcy courts have authority to hear and determine all cases under title 11, and all core proceedings arising under title 11, or arising in a case under title 11, and may enter appropriate orders and judgments, subject to review in the federal district courts. 28 U.S.C. § 157(b)(1). This is an action to avoid and recover preferential and constructively fraudulent transfers, and to disallow claims by LG Funding against Network Salon. As such, this court has jurisdiction to hear and resolve these matters pursuant to 28 U.S.C. § 157(b)(2)(B), (F) and (H).

Further, this court has jurisdiction to enter final orders on preference claims, regardless of

whether a claim was filed by the defendant, as the proceeding "stems from the bankruptcy

itself." *KHI Liquidation Trust v. Wisenbaker Builder Servs., Inc.* (*In re Kimball Hill, Inc.*), 480

B.R. 894, 905 (Bankr. N.D. Ill. 2012) (citing *Stern v. Marshall*, 564 U.S. 462, 498-99 (2011)).

## III. DISCUSSION

In its adversary complaint, the Trustee propounds three counts: preferential transfer,

constructive fraudulent transfer, and disallowance of claim.  The Court will examine each of

these counts in turn.

### A. Count I - Preferential Transfer

In Count I of the adversary complaint, the Trustee alleges that the payments that Network

Salon made to LG Funding under the agreements constituted preferential transfers within the

meaning of 11 U.S.C. § 547(b).  "The provision for recovering preferences is integrally bound

up in the overall scheme for ensuring equitable distribution among creditors. . . . Preferences are

avoidable precisely because they enable some creditors to receive more than their fair

distribution under the Bankruptcy Code." *West v. Freedom Med., Inc.* (*In re Apex Long Term

Acute Care–Katy, L.P.*), 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011).  This statutory provision

provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may
> avoid any transfer of an interest of the debtor in property–
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such
>> transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made–
>>> (A) on or within 90 days before the date of the filing of the
>>> petition; or
>>> (B) between ninety days and one year before the date of the filing
>>> of the petition, if such creditor at the time of such transfer was an
>>> insider; and

(5) that enables such creditor to receive more than such creditor would receive if–
　　(A) the case were a case under chapter 7 of this title;
　　(B) the transfer has not been made; and
　　(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Trustee asserts that the alleged preferential transfers were made within ninety days prior to the Petition Date, pursuant to § 547(b)(4)(A). Certain seemingly preferential transactions are excluded from avoidance under § 547(b), however, as codified in subsection (c). Specifically, LG Funding pursues the defense found in subsection (c)(2), which provides:

(c) The trustee may not avoid under this section any transfer–
. . .
(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–

　　(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
　　(B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2)(A) and (B).

As a threshold matter, LG Funding argues that it was not a creditor, and that the payments were not received from Network Salon due to an antecedent debt. LG Funding asserts that under New York law, MCA contracts represent the sale of accounts receivable; they are not considered to be loans. In turn, the Trustee argues that the transactions constituted criminally usurious loans, due to the high interest rates of the transactions, and further that LG Funding has admitted that the transactions were loans during this litigation.

There are many cases which support the proposition that the agreements between LG Funding and Network Salon are not loans. *Wilkinson Floor Covering, Inc., v. Cap Call, LLC, et al.*, 59 Misc. 3d 1226(A) (N.Y. Sup. Ct., N.Y Cty. 2018) (2018 WL 2293196 (Table) 2018 N.Y. Slip

Op, 50709(U) ("[B]ecause plaintiffs' obligation to pay [defendants] future receivables is conditioned on plaintiffs' receipt of such, the agreements at issue are not loans."). *See also LG Funding, LLC v. City N. Grill Corp.*, 2018 N.Y. Misc. LEXIS 728, at *4 (N.Y. Sup. Ct., Nassau Cty. 2018) (collecting cases). Since these transactions are not considered loans under New York law, they cannot be criminally usurious. *Rapid Capital Fin., LLC v. Natures Mkt. Corp.*, 66 N.Y.S.3d 797, 801–02 (N.Y. Sup. Ct., Westchester Cty., 2017) ("Because review of the terms of the agreement establishes as a matter of law that it is a purchase agreement rather than a loan, defendants' usury defense has no merit, and must be dismissed pursuant to CPLR 3211(b).").

The fact that the transactions in this matter do not constitute loans, however, does not mean that Network Salon did not owe a debt to LG Funding. In fact, in litigation in which LG Funding has been involved, New York courts describe the money owed by a merchant in a cash advance transaction as a debt. *See, e.g.*, *LG Funding, LLC v. Fla. Tilt, Inc.*, No. 15-CV-631(PKC)(VMS), 2015 WL 4390453, * 4 (E.D.N.Y. July 15, 2015) ("Along with FTI, Cartaya has not paid the debt owed by FTI and thus has breached that guaranty.") Further, the Bankruptcy Code defines a debt as a liability on a claim. 11 U.S.C. § 101(12). A "claim" within the meaning of the Bankruptcy Code is either a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment[.]" 11 U.S.C. § 101(5). LG Funding does not argue that it had no right to payment, and, in fact, argues the opposite— that it had the right to debit Network Salon's account under the Agreements. Thus, while New York law does not define the Agreements as loans, the transactions created a debt that Network Salon owed to LG Funding.

8

The Trustee's assertion that the Debtors' transactions with LG are usurious and for that reason are either fraudulent or not ordinary is mistaken. The Agreements state that New York law governs their enforcement and interpretation. New York law provides that a person is guilty of the fraud crime of criminal usury in the second degree, a class E felony when:

> not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

N.Y. PENAL LAW § 190.40 (McKinney 2018) (Stipulated - Joint List of Stipulated Facts and Documents, Dkt. 50, ¶ 234).

Putting aside New York court rulings that MCA transactions are not loans, New York usury law does not help the Trustee. Under New York law the penalty for making usurious loans is to have the loan declared void in future enforcement actions brought by the lender. *DLJ Mortgage Capital, Inc. v. Smith*, 2007 N.Y. Slip Op. 32745(U) ¶ 3 (Sup. Ct. 2007) ("This goes considerably further than New York's usury law, a violation of which only voids the loan and does not require the note-holder to disgorge past payments and interest.").

Even if the court found that the transaction was a loan, New York criminal law would not allow borrowers a private cause of action. *In re Merhi*, 518 B.R. 705, 719 (Bankr. E.D.N.Y. 2014). The usury statute does not help the Trustee.

The Trustee asserts that LG Funding made a judicial admission that the MCA transactions were loans because it cited a deposition of Ms. Hill in its Motion for Summary Judgment. Dkt. 49, p.38. The court disagrees. Ms. Hill's deposition was taken by a defendant in a different adversary proceeding, *Gecker v. Yellowstone Capital LLC*, 17 AP 00076. The transactions in issue were referred to as loans rather than MCAs. Such statements are not

9

admissions. *See Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) ("[A]

statement made in one lawsuit cannot be a judicial admission in another." Words used by

Yellowstone's attorney in a different case in questioning Ms. Hill are hardly admissions by LG

Funding in this separate lawsuit. The court notes that judicial admissions are statements made in

a pleading, such as a complaint, an answer or in a response to a request for an admission, not an

extrajudicial statement. *Murrey v. U.S.,* 73 F.3d 1448, 1455 (7th Cir. 1996).

The Trustee argued generally that LG Funding precipitated Network Salon's slide into

bankruptcy and put it out of business. Trustee's Proposed Findings of Fact and Conclusions of

Law, Dkt. 49 , ¶ 53. The court disagrees. The Debtors may have been on the brink of

bankruptcy or insolvency before the first MCA was executed. The Debtors' entry into

bankruptcy may have been delayed by selling the accounts receivable to the MCAs and

borrowing funds from LQD. In any event the Trustee has not accused the Defendant of causing

or deepening Network Salon's insolvency.[1] In addition, causing a debtor's insolvency is not an

element of preference recovery.

Now that LG Funding's threshold argument has been addressed, the Court will discuss

each element of § 547(b).

**1.     Transfer of an Interest of the Debtor in Property**

"The phrase an interest of the debtor in property refers to property that would have been

property of the estate had it not been transferred." *Martino v. Miszkowicz (In re Miszkowicz)*,

513 B.R. 553, 559 (Bankr. N.D. Ill. 2014) (internal quotations omitted) (citing *Maxwell v. Penn

Media (In re marchFirst, Inc.)*, Ch. 7 Case No. 01-B-24742, Adv. No. 03-A-1141, 2010 WL

---

[1] The court doubts that such a count would be actionable under New York law. *See In re Global
Service Group, LLC*, 316 B.R. 451 (Bankr. S.D.N.Y. 2004); *In re Fleming Packaging Corp.*, 2005 WL
2205703 (Bankr. C.D. Ill. 2005).

4027723, at *5 (Bankr. N.D. Ill. Oct. 14, 2010)). "Generally, property belongs to the debtor for purposes of § 547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors." *Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1217 (9th Cir. 1988).

There is no dispute as to the first element of Count I. The Trustee alleges in the Adversary Complaint that Network Salon paid LG Funding $112,979. (Dkt. 1, Adv. Comp. ¶ 64). LG Funding, in its Amended Answer, admits that this is the amount which was remitted to it under the Agreements. (Dkt. 20, Amended Answer, ¶ 64). As such, the Court finds that the transactions at issue were transfers of an interest of Network Salon in property under § 547(b).

### 2.    The Transfers Were Made for the Benefit of a Creditor on Account of an Antecedent Debt Owed by the Debtor Before Such Transfer was Made

The Bankruptcy Code defines the term creditor as an entity that has a claim against the debtor that arose at the time of or before the order for relief  . . ." 11 U.S.C. 101(10)(A).

Although LG Funding claims that it had a right to payment when it debited Network Salon's account, it argues that it is not a creditor. As discussed above, there is no doubt that Network Salon owed a debt to LG Funding after it provided funds to Network Salon. Although LG Funding did not file  proofs of claim in these bankruptcy cases, it has a claim within the meaning of the Bankruptcy Code since it argues that it had a right to payment. There is no doubt that LG Funding is Network Salon's creditor.

Further, the parties have stipulated that each debit that LG Funding made from Network Salon's bank account was made pursuant to the Agreements and for its benefit within the meaning of § 547(b).   Joint List of Stipulated of Facts and Documents, Dkt. 50, ¶¶ 222, 223. The court finds that the transfers in issue were made for the benefit of LG Funding on account of an antecedent debt owed by Network Salon before the transfers were made.

### 3.     The Transfers Were Made while Debtors Were Insolvent

The Bankruptcy Code defines the term insolvent as follows:

> (A) with reference to an entity other than a partnership and
> a municipality, financial condition such that the sum of
> such entity's debts is greater than all of such entity's
> property, at a fair valuation, exclusive of—
>> (i) property transferred, concealed, or removed with
>> intent to hinder, delay, or defraud such entity's
>> creditors; and
>> (ii) property that may be exempted from property of
>> the estate under section 522 of this title[.]

11 U.S.C. §101(32)(A).

According to Schedules D and E/F filed by Ms. Hill, the total amount of secured and
unsecured claims against her total over $4,000,000 (Bankr. Case No. 16-B-17113, Dkt. 1, pp. 8,
9, 21). On her Schedule A/B, Ms. Hill listed the total of her personal property at $1800, and on
Schedule C claimed all of that as exempt. (Bankr. Case No. 16-B-17113, Dkt. 20, p. 10).

Network Salon's Summary of Assets and Liabilities discloses that it owned at filing
property valued at $200 with liabilities of $4,181,845. (Bankr. Case No. 16-B-17117, Dkt. 18).

Section 547(f) of the Bankruptcy Code states that in preference actions debtors are
presumed to have been insolvent on and during the 90 days prior to filing for bankruptcy relief.
Defendant LG Funding has not offered any evidence to rebut the presumption. Due to the
Debtors's financial situation and the presumption, the court finds that Network Salon was
insolvent during the 90-day period that ended on May 20, 2016.

### 4.     The Transfers Were Made Within 90 Days of Filing

Section 547(b)(4)(A) of the Bankruptcy Code provides that the preference period for
non-insiders is ninety days before the date on which a debtor files a petition seeking bankruptcy

relief.  The parties have stipulated that LG Funding is not affiliated with or in any way related to

Network Salon or Ms. Hill and for that reason is a non-insider; the ninety day period is

applicable.  The preference look-back period is longer for insiders.

The parties have also stipulated that within the ninety day period prior to the Petition

Date, Network Salon transferred $38,994 to LG Funding through debits of Network Salon's

bank account.  (¶ 224 actually states that the ninety day period extended from February 22, 2016

to March, 28, 2016) Joint List of Stipulated Facts, Dkt. 50, ¶ 224.  This element is uncontested

and the Court finds this fourth element satisfied.

### 5.    Defendant Received More than It Would Have if the Transfers Had Not Been Made

Under the fifth and final element, courts look to whether the defendant creditor received

more through the transfers than it would have under  chapter 7.  *See Miszkowicz*, 513 B.R. at

560–61.  LG Funding has not filed a proof of claim in either of the underlying jointly

administered bankruptcy cases.  As such, LG Funding may not benefit from a distribution on

claims from the Debtor's bankruptcy estate.

The Debtors jointly owed their creditors approximately $4,000,000.  Their total assets are

approximately $2000, $1800 for Ms. Hill and $200 for Network Salon.  If the Trustee recovers

on this preference claim the bankruptcy estate will have approximately $40,000; after accounting

for the $600,000 owed its secured creditor LQD, unsecured creditors would recover nothing.

*See* Schedule D: Dkt. 1, p. 8 for Anthia Hill - 16-11713 and Schedule D: Dkt. 1, p. 5 for Network

Salon - 16-11717.  LG Funding received via the $38,000 payment alleged to be a preference

more than it would have received as a chapter 7 distribution had the transfer not been made.

*Miszkowicz,* 513 B.R. at 560-61.

### B. The Ordinary Course Defense to Preference Liability

LG Funding asserts a defense to the preference claim, arguing that even if the Trustee has

proven the elements of § 547(b) by a preponderance of the evidence, the transfers may not be

avoided due to the ordinary course exception.  This exception to preference liability, provided

for in § 547(c)(2) of the Bankruptcy Code, applies to transfers which are (1) made in payment of

a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor

and the transferee, and (2) where the transfer was made in the ordinary course of the business or

financial affairs of the debtor and the transferee; or made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A) and (B).  The ordinary course exception is meant to "leave undisturbed

normal commercial and financial relationships and protect recurring, customary credit

transactions which are incurred and paid in the ordinary course of business of both the debtor

and the debtor's transferee." *Kleven v. Household Bank, F.S.B.*, 334 F.3d 638, 642 (7th Cir.

2003) (citing *In re Armstrong*, 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999)).  LG Funding has the

burden of proving by a preponderance of the evidence that both the debt and the transfers in

payment of that debt were incurred in the ordinary course of business between Network Salon

and LG Funding.  *In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995).

### 1.    Transfers Made in Payment of a Debt Incurred by the Debtor in the Ordinary Course of Business

The first element of this defense requires that the debt for which the transfers were made

be incurred in the ordinary course of business.  This threshold requirement focuses on "when the

debt was created and then whether the debt was created in the ordinary course." *Baumgartner-*

*Novak v. Eckman (In re Eckman)*, 447 B.R. 546, 550 (Bankr. N.D. Ohio 2010).  In making this

determination, courts examine "the normality of such incurrences in each party's business

operations generally." *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R.

390, 398 (Bankr. S.D. Ohio 1998) (quoting *Youthland, Inc. v. Sunshine Girls of Fla., Inc.* (*In re Youthland, Inc.*), 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993)).

LG Funding is in the business of providing merchant cash advances to small businesses. In fact, no evidence was presented to show that LG Funding engaged in any other type of financing. LG Funding purchased a portion of Network Salon's future receivables. Entering into these types of transactions with small businesses was therefore in the ordinary course of business for LG Funding, and neither party has presented evidence to the contrary.

Ms. Hill recalls having a conversation with someone at Yellowstone Capital who told her they would put her in touch with another entity or person; she then got a call from someone at LG Funding. Trial Transcript, ("Transcript") p. 88.

Network Salon began receiving financing from MCA companies in January 2013, and continued to enter into this type of transaction until the 2016 Petition Date. The Trustee argues that it was not in the ordinary course of business for Network Salon to enter into this type of debt because the business was struggling financially and that its desperation for capital caused it to enter into these agreements. Network Salon began entering into merchant cash advance transactions with other MCAs in January of 2013, nearly two years before Network Salon entered into the Agreements with LG Funding. Throughout that period, Network Salon regularly did business with other MCA companies; in fact, Network Salon entered into MCA transactions with fourteen different MCA companies; Network Salon had fourteen bank accounts. Transcript, p .5.

Ms. Hill testified that it was ordinary for Network Salon to sign up for MCAs and that LG Funding did nothing out of the ordinary in the way that it debited the bank account from which it was paid. Transcript, pp. 111, 116. She also testified that aside from entering into a

second MCA with LG Funding that it did not request that it be paid more than what was

regularly paid.  *Id.*, p. 115.  Due to the length of time and the consistency of Network Salon

entering into these kinds of transactions, the court finds that entering into these types of

transactions became a normal, ordinary part of Network Salon's business.  Thus, the Agreements

were entered into within the ordinary course of business from the perspective of both parties.

The first element of the ordinary course of business defense has been satisfied.

When LG Funding entered into the Agreements Network Salon was the subject of 11

UCC-1 filings by other entities.   According to New York law, "[A] transferee of funds from a

deposit account takes the funds free of a security interest in the deposit account unless the

transferee acts in collusion with the debtor in violating the rights of the secured party."

N.Y.U.C.C. Law § 9-332(b).  As a transferee of funds from a deposit account LG Funding took

the funds free of security interests.

### 2.    Transfers Were Made in the Ordinary Course of Business

The second element of the ordinary course of business defense requires a showing that

the transfers were made in the ordinary course of business between the parties or according to

ordinary business terms.

> Among factors courts consider in determining whether transfers are ordinary in
> relation to past practices are: (1) the length of time the parties were engaged in the
> transactions at issue; (2) whether the amount or form of tender differed from past
> practices; (3) whether the debtor or creditor engaged in any unusual collection or
> payment activity; and (4) whether the creditor took advantage of the debtor's
> deteriorating financial condition.

*Solow v. Ogletree, Deakins, Nash, Smoak & Stewart* (*In re Midway Airlines*), 180 B.R. 1009,

1013 (Bankr. N.D. Ill. 1995) (quoting *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir.

1994)).  While these are some of the factors a court may consider, it is not an exhaustive list.

*Kleven*, 334 F.3d at 642. "In some instances . . . the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance." *Id.* at 643.

The Trustee argued in her Pretrial Brief [Dkt. 48] and at trial, that the transactions could not have occurred in the ordinary course of business because LG Funding was not entitled to take the money that it did from Network Salon's account. The Trustee's position is that under the Agreements, LG Funding could take only funds which Network Salon had received "for the payment of Merchant's sale of goods or services." Paragraph 1.9 - Sale of Receipts term of Agreements. Trustee's Exs. 18 and 28. The Trustee contends that the funds LG Funding debited from Network Salon's account were derived from other lenders and MCA companies when the Agreements state that "Payments made to LG in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1." Paragraph 1.1 provides that the Merchant shall appoint a bank to obtain electronic fund transfer services and allow LG Funding to deduct amounts owed it from settlement amounts otherwise due to the Merchant from electronic transactions, to pay LG Funding by allowing it to withdraw funds by debiting the account.

In response to the Trustee's argument, LG Funding asserts that the argument should be rejected as the Trustee did not assert this theory until shortly before trial, after the close of discovery. At trial, LG Funding argued the theory on its merits, stating that money is fungible and, therefore, as long as Network Salon was receiving income from its goods and services, LG Funding could debit the account that it was given access to, regardless of where the funds in that particular account originated.

Both Network Salon and LG Funding deviated from the contract term allowing LG Funding access to certain funds. Network Salon deposited funds from other MCAs into the account LG Funding had access to and LG took those other funds.

The Trustee argues that this is similar to cases where courts have ruled that transactions based on fraud are not ordinary and for that reason creditors can not stand on the ordinary course defense. *See Computer World Solution, Inc. v. Apple Fund, L.P. (In re Computer World Solution, Inc.)*, 427 B.R. 680, 690 where this court found that the circumstances surrounding a loan's inception and repayment, as well as its recording in the Debtor's books and records were fraudulent; *Jobin v. McKay (In re M & L Bus. Mach. Co.),* 84 F.3d 1330, 1339-40 (10th Cir. 1996) (determining that the ordinary course of business defense was not applicable to payments by a fake business set up to defraud people). Fraud disqualifies application of the ordinary course defense. However, this case is different. Neither the Plaintiff nor the Defendant committed fraud herein. Each party engaged in the routine, regular sale of accounts receivable and regularly disregarded the condition that LG Funding take proceeds of sales. This is not fraud. The court notes that the Trustee has not presented legal authority regarding whether deviations from contract terms in this manner vitiates the defense. Both Network Salon and LG Funding benefitted from this.

This court agrees with well-settled precedent that money is fungible. *See, e.g.*, *Boyer v. Belavilas*, 474 F.3d 375, 377–78 (7th Cir. 2007); *In re Quade*, 496 B.R. 520, 528 (Bankr. N.D. Ill. 2013). The parties stipulated that Network Salon deposited funds from other MCAs in the LG Funding account. Joint List of Stipulated Facts and Documents, ¶¶ 183 and 186. This is also evidenced by the fact that the three deposits to the LG account in November 2015 were $75,000 from LG; $4000 from the proceeds of an MCA transaction and $4000 from proceeds of a loan

18

from LQD.  Joint List of Stipulated Facts and Documents, Dkt. 50, ¶ 134.  The court can not say

with certainty whether any funds in the accounts included proceeds from the sale of goods and

services.

The court noted previously that someone representing Yellowstone, another MCA entity,

referred LG Funding to the Plaintiff.  Neither the creditors nor Network Salon were prejudiced

by how the payments were made.  In addition, the evidence shows that the MCA entities that

Network Salon dealt with regularly funded each others' payments and agreements when Ms.

Hill deposited funds into accounts dedicated to other MCAs.  This satisfies the "term of the

industry element" in section 547(c)(2)(B).  The Debtors were able to stay in business and

support Ms. Hill's family from 2013 to 2016 using MCAs.  Their dire circumstances were

unfortunate, however, the transactions did not amount to fraud on the part of Debtors or LG

Funding.

Since the court agrees with LG Funding on the merits, it will not reach the issue of

whether the Trustee's argument on this issue was raised in a timely manner.

LG Funding provided capital in the amount of $125,000 to Network Salon.  In return,

Network Salon granted LG Funding an interest in a percentage of its receivables.  The terms of

the Agreements provided that Network Salon would remit payment of the receivables "until the

amount specified below (the "Purchased Amount") has been delivered by Merchant to LG."  In

order for LG Funding to collect this amount, the contract also dictated the method of payment:

"The Purchased Amount shall be paid to LG by Merchant's irrevocably authorizing only one

depositing account acceptable to LG . . .  to remit the percentage specified below . . . of the

Merchant's settlement amounts due from each transaction, until such time as LG receives

payment in full of the Purchased Amount."  *See* Trustee's Exs. 18 and 28.

Pursuant to these terms, LG Funding debited money from Network Salon's bank account to recover the purchased receivables up to the specified amount under the Agreements. The parties in this matter were engaged in MCA transactions for nearly five months, from November 9, 2015 through March 28, 2016, during which time Network Salon remitted funds to satisfy its obligations under the terms of the Agreements.

LG Funding operates in the MCA industry, entering into MCA agreements on a regular basis. Network Salon, through Ms. Hill, began obtaining capital through MCA agreements nearly two years prior to entering into the agreements with LG Funding. Once the Agreements were signed, they were performed, in large part, according to their terms over the span of a few months. The court finds that the transfers to LG Funding were made in the ordinary course of business of the Network Salon and LG Funding; the second element of this defense has been satisfied.

The Trustee's § 547(b) claim under Count I must be denied because the transfers were made in the ordinary course of the parties' business and financial affairs.

### C. Count II- Constructive Fraudulent Transfer

In Count II of the Complaint, the Trustee alleges that the payments that Network Salon made to LG Funding are constructive fraudulent transfers within the meaning of 11 U.S.C. § 548(a)(1)(B). This provision provides, in relevant part:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
> . . .
>    (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
>       (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or

20

obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

Under the constructive fraudulent transfer provision, a trustee can avoid a transfer made for less than reasonably equivalent value if the debtor was insolvent at the time of the transfer, or became insolvent as a result of the transfer. *Id.* A claim brought under this section does not require proof of an intent to defraud. *4100 W. Grand LLC v. TY Grand LLC (In re 4100 West Grand LLC)*, 481 B.R. 444, 452 (Bankr. N.D. Ill. 2012) (citing *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir. 1996)).

As addressed above in the court's discussion of Count I, several elements of Count II have already been proven by the Trustee. In particular, it has been proven that (1) there were transfers of an interest of the Debtor in property; (2) the transfers occurred within two years of the Petition Date; and (3) the Debtor was insolvent when the transfers were made. The court's previous insolvency finding covered the period of the presumption, 90 days. The evidence shows that Network Salon was insolvent from 2013 to 2016.

The Trustee has to prove that Network Salon received less than reasonably equivalent value from LG Funding through the transactions. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). "The test used to determine reasonably equivalent value in the context of a

fraudulent conveyance requires the court to determine the value of what was transferred and to

compare it to what was received." *Id.* (citing *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223,

1234–35 (7th Cir. 1990)).   This determination does not involve the application of a fixed

formula; the transactions are examined on a case-by-case basis. *Barber,* 129 F.3d at 387

("[R]easonable equivalence should depend on all the facts of each case."   In 2016, the Seventh

Circuit said in the context of tax sales "[W]e apply to Illinois tax sales the same factors used to

determine reasonably equivalent value in other § 548 cases, including the fair market value of

what was transferred and received, whether the transaction took place at arm's length, and the

good faith of the transferee." *Smith v. SIPI, LLC, et al.* (*In re Smith*), 811 F.3d 228, 240 (7th Cir.

2016) (internal citation omitted)   (Compliance with Illinois property tax sale procedures is not

sufficient to establish that a tax sale was for reasonably equivalent value for fraudulent transfer

purposes).

The parties stipulated that, pursuant to the Agreements, LG Funding transferred $125,000

to Network Salon in exchange for a portion of its future receivables, with Network Salon

incurring the obligation to pay LG Funding $176,432.   LG Funding could debit up to 15% of

Network Salon's receivables until the total amount of $176,432 was paid.   Pursuant to the

Agreements, Network Salon transferred $112,979 in total to LG Funding.   This amount was

transferred to LG Funding through automatic debits by LG Funding of Network Salon's

account(s).   The debits occurred approximately once a week from November 9, 2015 through

March 28, 2016.   *See* Def's Ex. 2.   Overall, Network Salon received $125,000 from LG Funding,

but only gave value of $112,979 in return.

The Agreements provide that LG Funding paid fair market value for Network Salon's

receivables.   They state that: "Merchant agrees that the Purchase Price is in exchange for the

Receipts pursuant to this Agreement equals the fair market value of such Receipts." Trustee's

Exs. 18 and 28, ¶¶ 1.9 in each Agreement.

The court finds that each Agreement was formed in good faith. LG Funding assumed the

risk of non-payment; if Network Salon ceased producing income, LG Funding could not have

been paid. LG Funding did not order or require the Debtors to put the proceeds of other MCA

transactions into the accounts LG Funding had access to.

Based on the evidence presented, the court finds that Network Salon received reasonably

equivalent value under the Agreements. For that reason the transactions with LG Funding were

not constructively fraudulent transfers. The Trustee has not carried her burden of proving Count

II.

## C.  Count III- Disallowance of Claims

Count III of the Trustee's complaint asks the Court to disallow any claims filed by LG

Funding until it returns the transfers alleged to be preferential and fraudulent to the Trustee. In

support of this, the Trustee cites 11 U.S.C. § 502(d), which provides that "the court shall

disallow any claim of any entity . . . that is a transferee of a transfer avoidable under [sections

547 or 548] of this title, unless such entity or transferee has paid the amount, or turned over any

such property, for which such entity or transferee is liable . . ." This provision presupposes that

a transferee has filed a proof of claim in a debtor's bankruptcy case.

In statutory interpretation, courts begin with the plain language of the statute. *Cent.*

*States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001).

"Statutory terms or words will be construed according to their ordinary, common meaning unless

these are defined by the statute or the statutory context requires a different definition." *Id.*

(citing *Walters v. Metro. Educ. Enterprises., Inc.*, 519 U.S. 202, 207 (1997)). The plain

language of § 502(d) provides that a court may "disallow any *claim* of any entity" whose transfer

is avoidable under the specified subsections.  11 U.S.C. § 502(d) (emphasis added).  LG

Funding, however, has not filed a proof of claim in the chapter 7 bankruptcy cases of Ms. Hill

and Network Salon.  Because no proof of claim has been filed, § 502(d) is inapplicable; the

relief requested can not be granted.  The Trustee recovers nothing under Count III.

## IV.  CONCLUSION

The Trustee has failed to meet her burden to establish by a preponderance of the evidence

that the transfers were preferential or constructively fraudulent and therefore subject to

avoidance.  LG Funding has succeeded in establishing that the transfers were made in the

ordinary course of business, defeating the Trustee's § 547(b) preference claim.  The constructive

fraudulent conveyance claim fails because Network Salon received reasonably equivalent value

in the transactions in issue.  Judgment will be entered in favor of Defendant LG Funding on all

Counts.

This Memorandum Opinion constitutes the court's findings of fact and conclusions of law

in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Judgment Order

will be entered consistent with this Opinion.


**Date:  August 15, 2018**                    ENTERED:

                                             *Jacqueline P. Cox*
                                             _____

                                             **Jacqueline P. Cox**
                                             **United States Bankruptcy Judge**